23-1523, Meyer, Borgman & Johnson, v. Commissioner of Internal Revenue Mr. Fingered. May it please the Court. My name is Jeremy Fingered and I'm here representing Meyer, Borgman & Johnson. I'm joined at Council table by Mr. Reed and I'm joined in the front row by my son Zachary. MBJ is an award-winning engineering firm here in the Twin Cities. They claim the R&D tax credit, which is the most significant business incentive in the Internal Revenue Code. When this law was first being passed, Congress considered putting an exclusion that all work performed for others would not be allowed. And then they realized this is a credit for product development. Companies are going to develop products for others and sell them to others and make money. So that didn't make any sense. So they put in the funded research exclusion, which first and foremost, you must have a contract or grant that actually pays for research. If so, there's a two-part test. Number one, it looks at who has economic risk, looking at who bears the financial risk if the research fails. And number two, substantial rights. There's a 30-year history supporting the fact that fixed-fee contracts for an end product are not funded. And they're not funded because you're paying for the results of the research or the product and not for the research itself. Before you go too far, both the regulation of plane 41 and 41A, I'll call them. You know what I'm talking about. I'm sorry, 4 and 4A. I did better that time. But 4 and 4A have a lot of examples that the IRS intends to give guidance. What is the closest example to this case? That's very easy. The two closest examples actually come out of the court cases, the Geosyntec case and the populist case. No, no, no, no. Let's start with the regulations, sir, because they have a lot of deference at least for a while. And if you're not prepared for that, you can tell me. I don't mean to trick you. I'm not sure off the top of my head of which of the examples. That's great. And you do refer to them in your briefs. But as you may know, there are several, and I'm trying to figure out how many, 10 in plane 4. And I was just interested in which one you thought was the closest. But proceed with your argument. Sure. And obviously the regulation itself specifically says agreements that are contingent on the success are not funded. Fairchild, the Federal Circuit, specifically goes into it and it says, of course, this puts the risk of failure on the researcher because if the product is self, and Geosyntec, which is heavily relied upon by the IRS, they point to the 11th Circuit case. But this is off point. The district court looked at both fixed fee contracts, which is what we have here, and cost plus fixed fee contracts. And the district court found that the fixed fee contracts were not funded. They had inherent risk. And they found that the cost plus fixed fee contracts were, in fact, funded. We have all the fixed fee contracts here. The taxpayer appealed the cost plus up to the 11th Circuit, but the IRS accepted the ruling on the fixed fee contracts and did not, did not appeal this. So the 11th Circuit. Is that reflected in the 11th Circuit's opinion? The 11th Circuit only looked at two projects. Yes, but do they mention about the other cases you just talked about in their opinion? I don't believe. They do not reference the fixed fee finding, I don't believe. I don't believe either, but that's why I was asking. Go ahead. Right, because it was not appealed. The types of contracts are very significant because what happens in a cost plus fixed fee is that your costs are reimbursed. So regardless win, lose, or draw, even if the research is unsuccessful, the costs are paid for. If they're successful, they get a fixed fee on top of it, which is profit. In a pure fixed fee contract, somebody has to design or deliver X and they get paid Y. If they don't deliver, they don't get paid. And so the types of contracts being reviewed are very significant. I know the government relies on Dianetics as well, and in the Dianetics case, they do not review any fixed fee contracts. They are all cost plus fixed fee, level of effort, or time and materials. Interesting, in Dianetics, there is a fixed fee contract in Project AR-005. Part of the contract was fixed fee, part was cost plus fixed fee. The IRS conceded the fixed fee, which is what we're dealing with here, and only challenged the cost plus fixed fee. The populist order from 2019 out of the U.S. Tax Court is the most analogous to what we're dealing with here because the court looked at standard AIA contracts. Populist is an architecture firm. They make a lot of stadiums and event halls. Ten of the contracts we're are the same type of standard AIA contracts that were looked at by the court in Populist. Now, we don't have contracts on one, two, three, at least, of the projects. So we have to do something on those three, right, against you, on those three. Absolutely not against us. So the exclusion for R&D under 41D4. There's no contract. The law says contract. What the law says for an exclusion of 41D4 is that if your research is funded by contract, then it's an exclusion. If there's no contract on the research, there's no exclusion. That is the rule. It might be an ordinary necessary business expense, a plain old deduction, and not a sweet credit, right? Well, no, the credit is made up of business expenses. They're 174 expenditures. Yes, but otherwise they'd be ordinary, necessary, normal expenses, right? Well, all business expenses are ordinary and necessary expenses. They're— Not all. That's what the doctrine is for. But proceed. You and I are on tangent. Go ahead. Yeah. I mean, Your Honor, look, this is a credit. Let's take a step back. This is credit under Section 38 for businesses in the real world, right? Businesses in the real world, they develop products and processes. They do them to make money. They do them by expending regular expenditures every single day. So you're talking about normal business expenses. Of course, the expenses here are MBJ paying their engineers. Those are the wages that are questioned, right? Any business out there, when you look at Ford Motor Company claiming an R&D credit, you know what the expenses are? Them paying their engineers to design the next Mustang. That's what their expenses are. So, of course, those all fall into the bucket of normal business expenses, and they get subcategorized as 174 expenditures because they are for research and development purposes. But this is for businesses in the real world, and there are definitely some arguments out there that just don't make any sense that the IRS has made, right? When you look at this idea that, hey, there are complex, not enough complex technical specifications, okay, that's simply not true, and it's not based on the facts of this case. I want to give you an example to try and maybe hopefully get us on the same page. One of our projects here was a project done at the University of Minnesota here, the Northrop Auditorium. Okay, this is a hundred... Is that Carlton Arts? Tell me which one it is. University of Minnesota Northrop Auditorium. So the Northrop Auditorium... Is that phase two? Phase two. Okay, proceed. It's about a hundred-year-old building that is a historic landmark on the university's campus, and the auditorium was in disrepair, but the outside shell is a historic building. They had to figure out a way to core out the entire inside of the building and rebuild an entirely new auditorium, with 2,800 seats and new balconies and new everything, without hurting the facade of the building, because it's just historic. When you talk about it, you know, not hurting the facade, you're talking about the roof, too. There were columns in there holding a million pounds of weight, where they had to demolish the base of those columns and rebuild them to hold three million pounds of weight without the roof falling down and killing all the workers in there. So, you know, when you talk about, you know, whether or not there are technical specifications these guys had to meet, of course, these are huge hurdles. This was an award-winning project for its innovation, and yet the IRS is coming in and just saying, well, there's nothing you really need to do here. You just need to follow a standard of care. That is totally inaccurate, and this case was decided on summary judgment. All of these facts are in the record, and all of these facts should be viewed in a light most favorable to our client. If they couldn't figure out how to core out the auditorium and rebuild a new auditorium inside, they didn't get paid. That's risk. That is the financial risk that we're talking about here. But you only didn't get paid if you were at fault, right, under the contract? That's the final phrase about payment, isn't it? No. A fault basis? The contract is a standard contract. Address the fault basis of the contract. It's not about fault. It's about balance. I thought the word fault was used, counsel, in the contract. Is it not? Tell me if I'm wrong. Well, the basic term of the contract is MBJ designs a technical design, and they get paid for that technical design. If they can't design it, they're not getting paid. The risk in question is all about whether or not they can actually design, again, how to demolish the inside of the Northrop Auditorium and rebuild it. If they can't do that, then they don't get paid. This is like any other contract, and there are some arguments in there that just don't make sense. If you go down to a car dealership, Your Honor, and you walk in and you want to buy a new car, and you say, here's $50,000, I'd like the Cadillac, and they take your $50,000, and then they turn around and say, oh, wait, actually, we don't have that car. Sorry. But the contract doesn't say that we specifically have to give you your money back if we don't give you the car. That's not going to sit very well with you. It's not going to sit very well with anybody. That's what these contracts are. My client must deliver a technical design or they don't get paid. This is Contracts 101. I mean, if you don't deliver on the primary obligation under an agreement, you can't hold the other side to their primary obligations. And there's nothing in these contracts that says, if MBJ fails, the university has to pay them anyways. There's nothing in the contract that says, well, if they just give it the college try and they follow the standard of care, then it's okay. Even though they didn't get it done, pay them anyways. That doesn't exist. And that's what the standard is. I will reserve the rest of my time. And you may. Thank you, Your Honor. Mr. Willey. Good morning, Your Honors. Robert Willey on behalf of the Commissioner, and may it please the Court. The key to this case is the contractual allocation of risk. The contracts here allocate to the taxpayer the risk that it would not adhere to its professional standards. But that is not the same as bearing the risk of research failure. That is unsatisfactory performance risk, which the Geosyntec Court concluded was not sufficient to bring a contract outside of the funding exclusion. So the taxpayer's clients engaged its design services, and in providing those designs, the taxpayer agreed to adhere to its professional standards, but it didn't agree to specific technical barometers of success beyond that. As the Geosyntec Court noted, a funded contract, one, does not require installation and integration of specific elements. Two, each task is not subject to complex contract specifications. And three, the work is not subject to inspection and testing before acceptance. Those were the key elements of the Cherry Island contract in Geosyntec that had the Court find it to be a funded contract. And that describes these contracts here. In addition, the courts have emphasized the importance of strong client rejection rights. That's in the Dynetics case. In the Dynetics case, the Court required very specific language about the government's ability, the government was a client in that case, but the government's ability to reject the work product, it was not in conformance with the requirements of the contract and the specifications. That rejection language that the Court found important in Dynetics is not present in the contracts here. Counsel, I want to ask you the same question. The two regulations here are full of, well, full. One has five, one has ten examples. Is one of those close to this case? You know, I apologize, Your Honor. I'm not familiar enough with the examples. Thank you. But I think the taxpayer's argument, though, proves too much. It's difficult to imagine any contract that would fall within the fund exclusion under their sort of simplistic analysis of are you paid for a product. Contracts by their nature are bilateral agreements imposing mutual obligations on parties. So the fact that a contract calls for work product from one party is not the same as conditioning payment under a contract on a research success. The taxpayer, or the text of section 41D4H refers to research funded by any grant contract or other person, or otherwise by another person, right? Taxpayers' argument would read the term contract out of it and would really only apply to grants. Now, hold on. Has anyone addressed what the word otherwise means? I'm not aware of any case law that talks about what's your position and what otherwise means. Because you said you acted like it was grant or contract. It has the word otherwise. Go ahead. It does have the word otherwise. I mean, I suppose there could be other arrangements that between parties that don't. We're in Contracts 101. What could it be? I guess, I mean, off the top of my head, I suppose, you know, there would be gifts or some, just, you know, just other forms. I suppose there are other forms of funding besides contracts and grants. I'm not aware that the case law, the regulations have. The regulation doesn't touch the word otherwise, right? It does not touch the word otherwise. Right. I think, I suppose... Would that be held against the commissioner? That you got the word otherwise in there? Whatever the devil that means? Well, I don't think that that hurts us, Your Honor. I think that that underscores the expansive nature of the language in Section 41. Because it's talking about when the contract is funded. And that expands the language of when it's funded. So I don't think that that language would be held in the commissioner. I mean, I take the point that perhaps, you know, there's a gap in the regulation about what otherwise means. But I just don't think that that has too much to say about this case. Now, to the extent that the taxpayer identifies the quantitative benchmarks of success in the contracts, it only identifies clauses that talk about the basic parameters for construction. The total square footage, number of stories, the uses for the spaces in the building, and that the design be in compliance with local building codes. So what my friend on the other side was talking about, were that, yeah, they have to do complex work. It's difficult. And they have to, you know, make sure that... Well, they contract with an architect. He mentioned a couple of projects where they're contracted with an architect, right? So their contract is normally with the architect, who then contracts with the owner. Right. Right. How does that affect the case? Well, the contract with the architect, in general, is incorporated into the subcontracts. And I don't know, I mean, I don't know that it affects the case too much. I mean, I think you still would focus... I think the focus should still be on the subcontracts between Meyer and the architect. You know, there's also a contract between the architect and the owner. But in terms of the focus of where the risk is in the contracts, what are the provisions of the contract in terms of allocation of risk, the focus on that should be on the contract, the subcontract. What about distinguishing Rigsby? The Fifth Circuit case. Right. Well, I mean, I think Rigsby is helpful to our case. Because in the Rigsby, the Fifth Circuit rejected the argument that they're making here. Well, he says they didn't address facts like his. Well, I mean, the Rigsby contracts weren't precisely like this contract. So I don't... He says they left the fixed price at the tax court. I'm sorry. Are you referring to Rigsby or Geosyntec? Well, I'm talking about the Fifth Circuit's... Maybe he and I miscommunicated. I was talking about Rigsby, the Fifth Circuit. And he says that the fixed price contracts were not appealed. I think that... May I hear? I think you asked about Geosyntec and he responded to Geosyntec, Judge. Okay. Thank you. Sorry. I think we're talking about Geosyntec. Good. Because in, so Geosyntec, there were three contracts that were not, that the district court addressed that were not appealed to the Eleventh Circuit. And so, I mean, we think that the Eleventh Circuit's analysis of the Cherry Island contract is the most relevant and persuasive authority. Okay. I do want to ask about Rigsby, though, in the Fifth Circuit. You're familiar with the case, right? Yes. Okay. If we rule for them, do we have a conflict with the Fifth Circuit? No. I mean, I think what we're asking is consistent with what the Rigsby Court held. Because the Rigsby Court held that the contract there was funded. And so, I'm sorry, did you ask if you rule for us, would you have a contract? No, I meant for the other side. But I understood your answer, too. I'm sorry, if you... That one I was clear on. Go ahead. Okay. Sorry. Yeah. I think if you rule for them, there's then a conflict with the Fifth Circuit. But I think what we're asking for is consistent with what the Fifth Circuit said. Because in the Fifth Circuit, the Court rejected the argument that merely having a contract for a product or result is the same thing as having a contract that's contingent on research success. Now, and with respect to... I understand that. And part of the argument here is that this isn't just ordinary engineering service. This is highly complex, highly difficult, highly specialized. And it's not the same as, you know, listen, architect's going to build Ralph a house. The architect does consult with an engineer to make sure that everything is the way it's supposed to be. But the contract that's eventually entered into between the owner Ralph and the contractor is deliver the house, right? And that's at the end of it. And that situation is not the same as this situation. Because what we're looking at here is this sort of specialized obligation that is apparent in the nature of the contracts involved here. So you look at, which requires us to look at all the contracts. But they're saying that the deliverable is not just the same as build a house up to code. It's like solve all these problems and fix something and build it. Is that really a difference? I mean, you know, because in the end, is the contract just one on the part of the engineers to just deliver the product? And that inherent in that is complex engineering? Because by God, they do complex engineering. Or is it something more as they suggest? I mean, I think the best way to understand the contracts is that they're for a suite of engineering services. And that they have to provide deliverables in accordance with those contracts. But that the details of the design, as the tax court held, were largely up to their professional discretion. And they're held to a standard of applicable to like professionals. But they are not held to specific detailed benchmarks that are written into the contract that says you must succeed at each step or not get paid. But here, I mean, you've got a situation where, I mean, the deliverable is the roof can't cave in and kill everyone working below. And arguably, like most engineers couldn't do this. This is a specialized area. It's kind of piggybacking on what Judge Erickson was asking you. Maybe his question was better than mine. So doesn't that make it different? I mean, I think it makes it different than just a run of the mill contract to build a house. But I mean, I think it doesn't bring it to the level of an unfunded contract. Because there's, I mean, I think both Geosyntec and Fairchild, both of those cases involved specialized services and complex engineering. But the key difference between those cases was the specificity within the contract itself. Not a discussion of what goes on outside the contract with sort of how complex it is. You don't see discussions in there that talk about how complex it is outside of the contract's terms. Well, this is just inherently complex engineering. They talk about, you know, specifically what are the contract's terms. And so in the Geosyntec case, I mean, it said unlike the Fairchild contract, the project did not require installation and integration of specific elements. Each task was not subject to complex contract specifications. And Geosyntec's work was not subject to inspection and testing for acceptance. So it's those types of provisions that we're looking for. I hate to do this to you because you said you weren't familiar with them. But if you look at 4A and you look at example 5, it kind of looks like there that they're talking about that if you have a situation where they can't deliver and it turns out it's just impossible and you don't get paid, then they're supposed to amend the return and make the filing, and then the filing would somehow be allowable. Now, I'm not – taxes are not really very tight, so I'm not a genius on this. But I'm just telling you that it looks to me like they're saying that that's what you can do. And so your argument really essentially is that they don't have anything that's deliverable until they get to the point where they can't deliver, and then they can take the deduction. And if so, isn't there some kind of internal inconsistency there? Well, but I think you don't look at what – you don't look at sort of what ends up happening or what they can or can't do. You look at in the contracts themselves at the outset what is the contractual allocation of risk and what is the level of specificity and the level of complexity that the taxpayer is subjected to at the outset. So I'm not quite familiar with that example. Are you saying the level of contractual complexity that the taxpayer is subjected to at the outset? You just said the level of complexity. I assume that's contractual, how complicated the contractual obligations are. How complicated the specific requirements in the contract that the taxpayer must meet or not get paid, yes. I mean, this is what the tax court held in its ruling, that there's a certain level of specificity and complexity that has to be in the contract itself. And so if the contract does not reach that level of complexity and specificity, then you nonetheless are talking about an unfunded contract. The tax court said that it wasn't quibbling with the fact that the work is complex. It's not quibbling with the fact that the taxpayer has to do accurate measurements. But what the tax court said was the details of this are left to the discretion of the taxpayer. And so there is not the specificity in the contract about the specificity of what the tests they're going to do, the outcomes of the test, and they wouldn't get paid based on, for example, the outcomes of the test. So we agree with the tax court on that score. I think the tax court was right to survey the case law here and say, look, there's sort of two camps, and it's based on the level of specificity. There's a specificity in Fairchild, specificity in Geosyntec and Dynetics. And here we think we're in Geosyntec and Dynetics. We're not as concerned about the undertaking that they have taken on as we are concerned about what the contract says. I think that's right. I think you want to focus on the language of the contracts, not on, well, the complexity of what they're doing outside of the contracts. Unless the Court has further questions. Thank you. Thank you. Mr. Fahy, grant? Okay, lots of cover, little time. So first of all, the standard of care argument is the biggest red herring in the whole case. This whole idea that you've got to figure out what level of complexity is in the contract is there's been 40 years of litigating on this issue. The IRS has tried to create this heightened standard for engineering going back way into the 90s. There was the Discovery Rule test where they tried to say, you have to exceed, expand, or refine the common knowledge of science and do something crazy. It was shot down by the regs in the Fifth Circuit by McFerrin and the U.S. Tax Court in Union Carbide. Then they came back and said, everything's routine engineering, just like the standard of care arguments. Everything's simple and routine. They got blown up in the tax court on the Souter case. The fact of the matter is that this is a business credit. All businesses follow the standard of care. Because when you don't follow the standard of care, there's another name for that under the law. It's called negligence, and businesses get sued for it. Not only is it allowed, but it's a requirement. The four-part test under 41D for a project to qualify says projects must be technological in nature, which is defined as relying on physical and biological sciences, including engineering. We can't take an element to qualify and turn it into an exclusion. They're trying to—and Fairchild, the Federal Circuit, warns about this. And they specifically, Judge Erickson, address your wait-and-see question in Fairchild. They say, look, we don't need these subjective standards. We have a standard. The standard is, who bears the risk if the research fails? Here, the research is the design and development of structures in order to support buildings. This whole idea that there aren't technical specifications is a complete and total misunderstanding of what this industry is. A client's a structural engineer. In every single project, there is a building designed by the architect, and my client must design the structure to support that building with all of its details and all of its intricacies. And so the idea that they don't design to something, that doesn't make sense based on the industry and what they do. But most importantly, all the law supports our case. They want to point to Geo— Point all the law. What do you do with the Grigsby case? Yes. Let's address Grigsby. Thank you, Your Honor. Please do. So Grigsby, basically, there's three reasons that Grigsby is not applicable. So they looked at four projects. Three of them they kicked out on substantial rights, which has nothing to do with our case. It was only the East Bank project that they looked at and said, this is fixed fee, but we think it's funded. So number one, the most important thing is they looked to a specific provision in the contract, paid them, and had consideration and compensation for all risk. So that was the factual basis for it. That provision doesn't exist in any of our contracts. So it's distinguishable, number one. Number two, the court in the Fifth Circuit has verifiable error in its logic and reasoning. They also pointed to the Cherry Island project in Geosyntec and said, these contracts are just like Cherry Island. Cherry Island is a cost plus fixed fee contract, meaning that the costs of Geosyntec were all reimbursed. That's why the taxpayer moved to looking at inspection and rejection clauses and warranty clauses, because they couldn't rely upon the actual payment terms to show that there was economic risk. That's why they start arguing about other things. And then number three, the Fifth Circuit threw out there that, hey, this business got paid for this. That totally misses the entire point of the R&D tax credit. The R&D tax credit is for businesses. Businesses, when they develop products, they all get reimbursed somehow for their R&D if that research is successful. When we go to the pharmacy and pay $500 for a pill, it's not because it cost them 500 bucks to make it. It's because they're getting reimbursed for their research expenses. You ask a question about, hey, does it make a difference that it's the client, the owner, contracts with the architect, and MBJ? Absolutely, that makes all the difference in the world, because this whole point, the whole point of funded research is to say, who gets the benefit of the credit? Who gets it? Because who's bearing that risk? The architect wasn't bearing the risk. The architect wasn't going to take responsibility if the roof caved in on the Northrop Auditorium. The architects always say, hey, engineers, that's your domain. They specifically say, we're not taking any responsibility for what you engineers do. All the risk is on you. You're beyond your time. I'm sorry. Thank you, Your Honor. Thank you very much.